## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **HAROLD REYNOLDS,** | ) | **Case No.** _____ |
| **COMMUNITY TELECAST, INC.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | **AT LAW** |
| | ) | |
| **COX CABLE,** | ) | |
| **COX COMMUNICATIONS,** | ) | |
| **JOHN DOES 1-10,** | ) | |
| **Defendant.** | ) | |

1. The Plaintiffs Harold (Trip) Reynolds, and Community Telecast, Inc. also known as CTI22 (Channel 22) files this complaint against Defendants Cox Cable, Cox Communications, John Does 1-10 ("Defendant") for breach of contract, quantum merit, res ipsa loquitor, implied contract and unjust enrichment for Plaintiff's contractual damages in excess of $75,000.00 based upon diversity of citizenship.

2. Plaintiff brings this action against the Defendants

pursuant to 42 USC § 1981, 1983, 1985 for disparate treatment with contractual relationship based upon race, disparate treatment based upon race for violation of the Plaintiffs Federal Civil Rights based upon age and race by the Defendants pursuant to Neb. Rev. Stat. § 25-219. Plaintiff also files this complaint because Defendant branded Plaintiff as a "minority affairs" channel.

## PARTIES

3. Plaintiff Reynolds is, and all times mentioned, was a resident of Omaha, Douglas County Nebraska.

4. Reynolds is Chief Executive Officer (CEO) of Cox Channel 22 CTI22.

5. Reynolds is African American.

6. Plaintiff Channel 22 CTI22 is a non-profit IRS 501 (c ) (3) organized under the laws of Nebraska. All members of the Channel 22 CTI22 are residents of Nebraska.

7. Defendant Cox is a corporation  duly organized and existing under the laws of the state of Georgia having the principle place of business in Atlanta, Georgia and at all times material has been engaged in the business

2

of providing cable television to the city of Omaha. Georgia is the nerve center of the Defendant and the principle place of business of the Defendant.

## STATEMENT OF JURISDICTION

8. This action is based upon diversity of citizenship between the Plaintiff and the Defendant for contractual damages in excess of $75,000.00 for breach of contract, quantum merit, res ipsa loquitor, implied contract and unjust enrichment.

9. This action is brought for damages for discrimination in contractual relations based upon race and age discrimination and damages under 42 USC § 1981, 1983 for violation of the Plaintiffs Federal Civil Rights pursuant to Neb. Rev. Stat. § 25-219 damages under 42 USC § 1983 for violation of the Plaintiffs Federal Civil Rights by the Defendant pursuant to Neb. Rev. Stat. § 25-219

10. This action arises under the Constitution and laws of the United States, the Civil Rights Act, Title 42 U.S.C. Section 1981, 1983, 1985, 1986, and 1988. Jurisdiction

is conferred upon this court by Neb. Rev. Stat. § 25-219, 28 USC §1331 and 28 USC §1343(a) (3) and this court has jurisdiction over the supplemental state claims. Venue of this action is proper under 28 USC §1391(b).

11. The jurisdiction of this Court is invoked for Plaintiff's causes of action under the provisions of 28 U.S.C. Sections 1331 and 1343 and 28 USC §1391(b) which confer original jurisdiction on Federal District Courts to sit and redress the deprivation under the right to contract,  color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the Plaintiff by the Fourteenth Amendment to the Constitution of the United States; including the right to due process and equal protection of the law.

## STATEMENT OF FACTS DISPARATE, INEQUITABLE, AND DISCRIMINATORY TREATMENT

12. Plaintiff is an independent, minority-operated and controlled, IRS 501 (c)(3) entity, which operates from a third-party facility located in North Omaha and

4

categorized by the City of Omaha and all local media as an area of urban blight. CTI 22 began operations in 1993. It currently operates under a "Community Programming Agreement" with Cox Communications that was signed on September 5, 2000. The agreement has been continuously in place since 2000. The agreement is provided for in the Franchise Agreements between Defendant Cox and Plaintiff. Prior to May 2012, "The public access channels are not "City" channels but are channels provided by Cox as a condition of their franchise. Neither does the City administer the public access system. That responsibility lies with Cox. The City's role is to see that **public access** is provided and administered in a **fair and nondiscriminatory manner** and in compliance with the franchise agreement. The "city-channel" model in which the governmental entity administers the channels and is responsible for its functioning is used in some other franchises but it has never been adopted here. Just the opposite model exists in Omaha; public access is

5

solely the responsibility of the cable company."

13.     The contract between the defendant and the Plaintiff states, "TKN, H&W and CTI shall be responsible individually for **all expenses involved in providing or distributing their respective programming** over their respective channel(s) including (without limitation) the cost of program production, related    equipment, promotion and any appropriate interconnection with the systems headend; and for the securing all necessary copyright and performance clearances (including music performance clearances) and other required licenses." Cox is responsible for administering all of the PEG channels including channel 23 and channel 22. Defendant provided no definition of "programming" in the contract. The contract did not define nor prohibit payment for the "operating" expenses of the Plaintiff. Upon information and belief, Defendant covered the "operating expenses" of Channel 23. The point which was not covered by the express contract between the Plaintiff and the Defendant was the

"operating" expenses of the Plaintiff. Operating expenses are rent, utilities, staff, location, telephone service and salaries. Plaintiff also has not been compensated for operating the community calendar (Monday through Saturday, from 12:00 AM to 4:30 PM, and Sundays from 12:00 AM to 8:00 AM).

## DISPARATE TREATMENT

14.    As established by the Franchise Agreement, Defendant agreed that the success of public access is largely dependent upon the promotion of public access, including its availability.  However, Defendant has consistently and repeatedly refused to respond to or work with Plaintiff to promote public access, or to inform citizens of Omaha about the availability of community access via Plaintiff to all citizens. Defendant was and remains emboldened to engage Plaintiff in disparate treatment.

15.    To reduce Defendant's operating expenses, in December 2000, the Omaha City Council agreed to allow Defendant to relocate the public access studio

7

Channel 23 from the Center Mall to the Cox office at 11505 West Dodge, thereby enabling Defendant to completely eliminate all third-party PEG operating expenses, including rent and utilities, required to maintain and operate Channel 23 from a separate, centrally located, third-party broadcast facility.  The Agreement to relocate to the Defendant's "on site" public access studio, included a laundry list of "state of the art" audio/video production equipment, editing suites, on-site storage for sets and props and more; but given the savings generated by the relocation and the cost to upgrade the new facility, a comparable expense, facility upgrade, and technology upgrade was not made available to aid Plaintiff's administration of Channel 22. Defendant held fiduciary responsibility to ensure PEG access to all citizens, including citizens residing in socio-economically blighted urban areas. Defendant is required to administer the PEG system in a fair and nondiscriminatory manner but did not.

## INEQUITABLE TREATMENT / UNREIMBURSED EXPENSES FOR PEG ADMINISTRATION OF CHANNEL 22 PRIOR TO MAY 2012

16.     It was the Defendant's responsibility to administer the PEG system, but Defendant abdicated this responsibility by unilaterally requiring Plaintiff to administer all content and incur all operating expenses for Channel 22.  Further, Defendant continued its practice of administering the PEG systems unfairly and in a discriminatory manner by consistently providing financial and operating support (rent, utilities, equipment, supplies, salary, insurance, and other operating costs, etc.) to administer the independently non-minority owned, controlled and operated public access Channel 23 when located at the Center Mall and Defendant continues to provide financial support to administer Channel 109 at the non-minority owned, controlled and operated Cox office at 11505 West Dodge.  At no point did Defendant compensate Plaintiff for "operating expenses" of rent, utilities, equipment,

supplies, salary, insurance, and other operating costs,

etc. required to administer public content produced by

both individuals and groups on the independent,

minority controlled and operated Channel 22.

Defendant abdicated responsibility for administration of

Channel 22 to Plaintiff. Defendant is required to

administer the PEG system in a fair and

nondiscriminatory manner but did not.  Plaintiff

informed Defendant it had no funds for administration

of Channel 22 prior to execution of the Community

Programming Agreement.  Plaintiff is an independent,

minority-operated and controlled, IRS 501 (c) (3) entity,

which operates from a third-party facility located in

North Omaha and categorized by the City of Omaha and

all local media as an area of urban blight.

17.     During the past twenty-(20) years, financial

support provided to Plaintiff from the Defendant for the

administration of Channel 22  has been limited to: (1) a

grant of approximately $110,000 for audio/video

equipment and related expenses, and two smaller grants

of approximately $12,800 in 2009 and $12,800 in 2008. All other expenses including service, repair, replacement of equipment, supplies, transportation, rent, and facility upgrade, service and repair, insurance, phone/internet, taxes, set construction, etc., are all paid by Plaintiff, including $23,000 derived from a second mortgage loan from Dr. Everett S. Reynolds in 2009, and $15,894.72 derived from a pension savings loan from Everett S. Reynolds, II and Trip Reynolds in 2011 and 2012.

18.     As reported in research commissioned by and reported to the Omaha City Council in the "Cable Related Community Needs Assessment" by Riedel Communications, Inc., on December 9, 2009, "The current situation in which staff are not paid nor receive any benefits is unsustainable. While there are access centers that are run by volunteers (frequently Board Members), they are in very small rural areas, not in cities like Omaha. If we compare salaries of other access center staff we would recommend the following salaries for each of the existing positions (2009 salary data):

President/CEO $46,000 minimum, $50,000 midpoint; General Manager $40,000 minimum, $45,000 midpoint; and Station Engineer $35,000 minimum, $45,000 midpoint."

19.     Absent from the analysis by Riedel Communications, Inc. is that Plaintiff is required to meet the same broadcast production requirements, 24/7/365, as TKN, H&W and Cox Channel 109 but without human capital support from paid staff, and without volunteers, except for the Station Engineer (1993 to 2013) and General Manager who volunteered his services beginning in 2008. Consequently, Plaintiff's uncompensated staff must multi-task the performance of all usual and customary broadcast jobs and functions, which includes but is not limited to: President/CEO, General Manager, Accounting Manager, Program Scheduler/Traffic Manager, Fund Raiser, Webmaster, Media/Public Relations, audio/video technician, broadcasting technician, set designer, photographer, and graphic designer. Accordingly, as validated by the U.S.

Bureau of Labor Statistics (SOURCE: bls.gov {27-4099}), an accurate job pricing for the President/CEO and General Manager position is: mean value of $73,080 (2011), mean value of $78,285 (2013, adjusted annually by 3.5%); and Station Engineer mean value of $69,160 (2011), mean value of $74,086 (2013, adjusted annually by 3.5%).

20.   As with the continued payment of Defendant's employee Chris Craddock for ongoing operational management of Channel 23 and 109, which continued after the City of Omaha took legal possession for administration of the PEG system from Cox Communications in May 2012, Plaintiff seeks payment of $1,717,548.01 for compensation of operational management performed by Plaintiff's staff (President/CEO/General Manager and Station Engineer) from September 2000 to April 2012; and compensation of $136,238.36 for operational management performed by Plaintiff's staff to administer Channel 22 from May 2012 to February 2013.

21. Plaintiff has consistently complied with all aspects of the 2000 Community Programming Agreement: (1) anyone can become a member of CTI22, but Defendant has never promoted such; (2) Plaintiff's production fees are detailed in a published production rate schedule at http://www.cti22.org/CTI22-ORIG/media.services.htm; (3) in compliance with the Agreement, and if or when requested by individual program producers, Plaintiff provides patron/sponsor acknowledgements at the beginning and ending of programs; (4) Plaintiff has only received three-(3) grants in its entire 20-year existence; (5) Plaintiff runs more PSAs than all television stations in Omaha combined – and at no cost to any organization or individual; (6) Defendant has consistently refused to support any fund-raising methods proposed by Plaintiff, including a "5K-Walk/Run" to promote health and fitness:http://www.cti22.org/CTI22-ORIG/Events/CTI22-5K/programs-CTI22-5K.htm.

22. Notably, Plaintiff has no staff due to its limited annual budget of approximately $37,000 in 2007 (of which it

14

did not receive one-third of this amount because of no-pays) to a high of $79,000 in 2010 of which approximately 28% was debt service (business loan due to program producers who consistently paid late and no-pays).  As a direct result of the Defendant's on-going efforts to prevent Plaintiff from "growing the business," Plaintiff's annualized operating budget has been reduced to less than $19,000 for FY 2013 and has dropped significantly to income of only $1,260.00 for February 2013 versus expenses of $6,439.00.

23. Plaintiff's altruism to expense and broadcast content from or for the citizens of Omaha has consistently been met with rejection, denial, and avoidance from the Defendant.   The most significant aspect in the administration of Channel 22 is the fact that most citizens still believe and expect they should be able to broadcast their programs for "free" because that's what the Defendant and City of Omaha told the citizens of Omaha with the execution of the original Franchise Agreement in 1980.   This fact continues to create

financial problems for the Plaintiff, and with no equitable financial support from the Defendant, and no tax-base to access as with TKN, Plaintiff has consistently incurred inequitable and disparate treatment. It was disingenuous and deceitful for the Defendant to promote "free" public access on Channel 22, when Defendant never negotiated such as a specific element of the Franchise Agreement, and when "free" actually means all costs to administer public access on Channel 22 are born by the Plaintiff.

## DISCRIMINATORY TREATMENT

24. In the "Statement of Conditions" for the relocation of the Defendant's location from the Center Mall to West Dodge, Defendant's agreed that the " . . . new location will be of a digital format that is state of the art at the time the new location is approved by the City Council" but no such agreement was made to upgrade or create a comparable facility for CTI22 Channel 22. Therefore, as required by the City of Omaha, Defendant did not

administer public access " . . . in a fair and nondiscriminatory manner."

25. Given that it was Defendant's responsibility to administer the PEG channels, the responsibility for all costs associated with the administration of Channel 22 should be born by Defendant – and not Plantiff, but Defendant shifted the entire expense for the administration of Channel 22, including its responsibility for managing the Community Calendar, to Plaintiff, while also refusing to compensate Plaintiff for staff and operating expenses required to manage and broadcast the Community Calendar.  At no point has Defendant or any other entity reimbursed Plaintiff for any operating expenses (rent, utilities, staff support, supplies, equipment, etc.) associated with Plaintiff's administration of Channel 22.

26. Plaintiff is the only PEG broadcast entity specifically named in the 2007 Franchise Agreement Addendum and by oral agreement with Defendant, Plaintiff agreed to broadcast the Community Calendar.  Plus, as reported

by Riedel Communications, Inc., on December 9, 2009,
Plaintiff operated under a "Community Programming
Agreement" with Cox Communications that was signed
on September 5, 2000. The agreement is provided for in
the franchise agreement between the City of Omaha and
Cox Communications."  Both the Franchise Agreement
and the Community Programming Agreement (CPA) are
**inextricably** joined.   Plaintiff's agreement is with
Defendant.   Equally importantly, the term of the
Community Programming Agreement is only for a
period of two plus (2+) years beginning August 17, 2000
and expiring December 31, 2002, which included a
discretionary ""rollover" of 1-year extensions, but
Defendant never generated a required 90-day written
notification to terminate Plaintiff's responsibility for its
unilateral administration of Channel 22.   Therefore,
Defendant is culpable in transferring the entire cost for
administering Channel 22 upon Plaintiff particularly
when the obligation to broadcast content is not for the
benefit of the Plaintiff, but solely to broadcast

18

copyrighted content received from or for the immediate benefit of the citizens of Omaha**.**

## REDUCTION AND ELIMINATION OF

## FIRST AMENDMENT RIGHTS

27. To further reduce its operating costs, Defendant eliminated Channel 23 as a PEG station, and  (1) transferred all content to an all-digital, pre-recorded format on Channel 109; (2) eliminated the broadcast of any "live" content; and (3) reduced or eliminated the ability of citizens of Omaha to access the channel by requiring, as a financial deterrent, the additional lease and/or purchase of a converter box to receive content. Defendant's on-going practice is to circumvent First Amendment rights by providing citizens of Omaha with:

28. Significantly less physical access to PEG facilities – even when presented with state-of-the-art options that provide greater access and which are more cost efficient;

29. By converting Channel 23 to a digital-only Channel 109 with absolutely no "live" broadcasts; thereby preventing

citizens of Omaha with the ability to broadcast same-day content involving current events and issues;

30. By their intentional "negligent management" and "absentee landlord" administration of Channel 22, and their strategic and protracted destruction of Plaintiff's business operations, Defendant restricted citizens access to the only television station in metro Omaha to routinely broadcast "prime time" debates and political forums for local, state, and national elections;

31. No promotional support to Plaintiff for administration of Channel 22; in fact, there is absolutely no record of Defendant working with Plaintiff to specifically, consistently, and most importantly, to plan and accomplish strategic business outcomes to promote and advance public awareness of and public access to Channel 22;

32. After having never promoted public access, or enabling its accessibility to the majority of citizens of Omaha who are White, on May 10, 2011 before the Omaha City Council meeting Defendant's Attorney proposed that the

20

Omaha City Council discontinue any support for PEGs, and not to inform citizens of Omaha of their rightful access to public/community access;

33. Preventing Plaintiff from broadcasting content from or for the clear majority of Omaha's citizens who are White by:

34. In violation of the Community Programming Agreement confining the Plaintiff's broadcast facility to an area notorious for crime and urban blight and that is not centrally located for the benefit of all citizens of Omaha; and

35. Branding both the Plaintiff and Channel 22 as a "minority affairs" content provider and/or channel contrary to the character and scope of the Franchise Agreement and the Community Programming Agreement, which do not identify either Channel 22 or Community Telecast, Inc. or Plaintiff's d.b.a. acronym "CTI22" as a "minority affairs" entity;

36. Defendant actively sought to curtail Plaintiff's successful and egalitarian administration of Channel 22, including Plaintiff's demonstrated success in providing greater access to citizens of Omaha to exercise their First Amendment rights than all metro Omaha television stations combined.  For the PEG channels, as reported to the Cable Television Advisory Committee in October 2010, in its administration of Channel 22;

37. Plaintiff consistently broadcast more first-run, local origination programming hours than any other PEG channel: The Knowledge Network's Channel 17 = 54 hours vs. Community Telecast, Inc.'s Channel 22 = 176 hours; The Knowledge Network's Channel 18 = 75 hours vs. Community Telecast, Inc.'s Channel 22 = 176 hours; Cox Public Access Channel 109 = 68 hours vs. Community Telecast, Inc.'s Channel 22 = 176 hours.

38. As reported to the Cable Television Advisory Committee in October 2010, in its administration of Channel 22, Plaintiff consistently broadcast more public service announcements than any other PEG channel,

22

including the Defendant: Cox Communications System-wide = 8 announcements vs. Community Telecast, Inc.'s Channel 22 = 398 announcements;

39. Plaintiff has an operating budget that's more than 1,500% less than either the Knowledge Network or Cox's public access Channel 109, and Plaintiff broadcasts more original first-run content than all other metro area TV stations combined: more public service announcements; more original programming involving elected officials; more original, Omaha-based programming for African-American, Latino, Native American, Asian, and other ethnic groups; and more original, Omaha-based religious programming.

40. Additionally, in research commissioned by and reported to the Omaha City Council in the "Cable Related Community Needs Assessment" by Riedel Communications, Inc., on December 9, 2009, Plaintiff "… operating well with a single channel and produces much more programming (CTI22 = 38.5 hours) than access channels of the same or even greater budget (9 to

21.5 hours)."

41. Riedel Communications also reported "CTI22 has an established reputation throughout the City of Omaha. Moving Channel 22 from its channel location will cause it irreparable harm. It is important that the new franchise agreement contain a provision that will not allow Channel 22 to be easily moved by the cable operator." Plus, in an executive summary commissioned by and reported to the Omaha City Council in the "Omaha Needs Assessment Executive Summary" compiled by Dr. Barry Orton., on December 9, 2009, "Channel 22 CTI22 is providing a considerable and highly cost-effective service." Nevertheless, the Defendant removed Channel 22 from broadcasting content on channel 22.

## DISCRIMINATION

42. Plaintiff's attempts to provide better and more broadcast services to the public have consistently been circumvented and denied by the Defendant via blatant acts of discrimination:

43. On November 4, 2008, Nebraska passed ballot Initiative 424, which eliminated the application of Affirmative Action for all state, county, and local government jobs in Nebraska.    To eliminate perception that Plaintiff's operation of Channel 22 (via the "local government") was based on race or Affirmative Action, Plaintiff requested Cox to discontinue any references to Plaintiff as its "minority affairs" channel.    While the City of Omaha functioned as an absentee landlord, Defendant continued to label "Channel 22" as its "minority affairs" channel thereby, upon information and belief continuing to alienate the majority of Omaha citizens, who are White, from considering use of the public accommodation provided by Plaintiff.

44. Defendant repeatedly labeled both Channel 22 and the Plaintiff as "minority affairs even though the Franchise Agreements made no mention of such; and Defendant confined promotion of Channel 22 to its web site with no corresponding or independently produced direct mail campaigns, video spots, PSAs, multiple web site

integration, radio spots, print ads, name (no cash) sponsorship community events such as 5K races/walks, etc. Also, the City of Omaha took absolutely no effort to promote CTI22 Channel 22 with any internal print or electronic communications, and no members of the Omaha City Council, through their leadership, take any regular, on-going effort to communicate with the electorate via CTI22 Channel 22.

45. Defendant allowed repeated interruption in broadcast services to discourage public support of the Plaintiff, to promote the stereotype of incompetence due to the Plaintiff's race and location of Plaintiff's broadcast facility in a notorious area of urban blight

46. Defendant has many years of experience in broadcasting, has knowledge of the financial underpinnings of a broadcast enterprise, in terms of reliance on customers, and given that Defendant was recognized by Diversity, Inc. as one of the Top 50 Companies for Diversity, and one of the Top 10 Companies for African Americans, Defendant is

immediately aware of the negative impact given to minorities, particularly Black people, in metro Omaha: (1) Even considering the size of Omaha's Black population, the percentage of Blacks who work in management positions is the eighth-lowest in the country, and while the number of Black managers has been on the rise nationally, Omaha's figures dropped 25 percent between 2000 and 2005; (2) At nearly 17% in 2005/06, Omaha has the 8th highest* unemployment rate in the U.S. for Blacks; (3) Omaha's percentage of Black children in poverty* ranks No. 1 in the nation, with nearly six of 10 Black kids living below the poverty line; (4) In Nebraska, 97% of all state, county and local government jobs*** that pay over $70,000 a year are held by White people; (5) In Omaha, 42.7% of all working-age (16 to 64 years of age) Black males are either unemployed or out of the work force; (6) One of every four drivers pulled over by Omaha police officers in 2010 was black. Omaha Police Department stops and arrests Black drivers at rates higher than their proportion

of the population; and (7) Cox was recognized by Diversity, Inc. as one of the Top 50 Companies for Diversity, and one of the Top 10 Companies for African Americans. Therefore, Defendant intentionally sought the demise of both Plaintiff and its administration of CTI22 Channel 22 by labeling them both as "minority affairs" and Defendant knew or ought to have known the negative economic impact which may be expected to result if the professional competency and integrity of a broadcast enterprise are called into question in such a way as to undermine public confidence in the ability or capacity of the Plaintiff to competently and professionally manage and provide broadcast services.

47. Despite oral and written requests for Channel 22 for nearly four years, Defendant intentionally negotiated a new Franchise Agreement to keep Plaintiff at its current location, thereby preventing Plaintiff from creating equitable physical access to the broadcast public accommodation provided to the citizens of Omaha by Plaintiff.

48. REFUSAL TO COMPLY WITH CONTRACT – Since 2009, in compliance with the 2000 Community Programming Agreement with Defendant, Plaintiff has sought at its expense relocation of the fiber optic hub to another facility to create greater access to citizens of Omaha, but has consistently been prohibited from such by Defendant.   Defendant has consistently: (1) flip-flopped as to what entity has authority to approve such relocation, (2) has intentionally fabricated an adverse cost to dissuade Plaintiff from pursuing relocation; and (3) intentionally procrastinated in approving relocation of the fiber optic hub to prevent Plaintiff from creating a successful business operation in a non-blighted urban area.

49.    Conversely, the other PEG broadcast entity, the Knowledge Network (TKN), which is a consortium of six-(6) tax-supported member school districts (Creighton

University, Omaha Public Schools, University of Nebraska at Omaha, Westside Community Schools, Iowa Western Community College, and Metropolitan Community College) has operated Channels 17 and 18 from its tax-supported UNO facility campus, and therefore, all facility, staff, utilities and other administrative costs are absorbed within the UNO budget and by its tax-supported White controlled and operated members. TKN has consistently been given "favored nation status" such as operating two PEG channels instead of one, and with rare exception, it strictly confines its broadcast content to its core members.

50.    Channel 22, was contemptuously labeled by Defendant as its "minority affairs channel" is the only PEG channel that operates from a facility it does not own and where it must pay numerous third-parties, including Defendant, in order to administer, produce and broadcast content from or for the citizens of Omaha on Channel 22. Given that the May 15, 2007 Addendum

makes absolutely no reference to a "minority affairs channel" and specifically recognizes Community Telecast, Inc. (CTI), Defendant thereby intentionally sought the demise of both Plaintiff and its administration of Channel 22 by: labeling both Plaintiff and Channel 22 as "minority affairs" to restrain, circumvent, and prohibit interest and financial support from the majority of Omaha citizens who are White; forcing all aspects for administration of Channel 22 upon the Plaintiff without compensation or reimbursement for rent and utilities **($120,000 – September 2000 to February 2013),** or reimbursement for telephone and internet ($52,500 – September 2000 to February 2013) while earning profit from Plaintiff's non-profit 24/7/365 administration of non-commercial broadcast services to and for the citizens of Omaha; and requiring Plaintiff to function as the only broadcast entity that does not own the facility from which it operates while also refusing to provide equitable financial support and compensation; although

Defendant provided financial support for the administration of channel 23 and channel 109.

## INEQUITABLE / UNREIMBURSED EXPENSES FOR PEG ADMINISTRATION OF CHANNEL 22 AFTER MAY 2012

51.     As reported in the "Cable Related Community Needs Assessment" by Riedel Communications, Inc., on December 9, 2009, "Channel 22, CTI22 is not just a programmer; it is the entity managing a channel," which is no different than TKN, and equal to the same compensatory value of $2,000,000 paid by Cox to the City of Omaha for possession of channel 17.

52.     CTAC affixed the value of broadcasting content on Channel 22 at $11,000 per month via payment to Defendant to provide such service for December 2012, January 2013 and February 2013.  Without regard to the breath and scope of broadcast services provided by Defendant, Plaintiff has and continues to administer and broadcast more content on Channel 22, but without equivalent compensation or reimbursement for

expenses.

53. Defendant openly engaged in a discriminatory practice by keeping the Plaintiff in an adverse location and prohibiting the Plaintiffs move in violation of the 2000 contract.

## COX PAID RENT TO CENTER MALL BUT DID NOT PAY RENT TO OIC

54. Defendant has not been responsible for administering content on Channel 22; Plaintiff has unilaterally performed this role. Other than installing a fiber optic headset in the Omaha Opportunities Industrialization Center (OOIC) facility, and a one-time allocation of equipment and limited funding in 2007, Cox has not provided money for the "operating expenses" of Channel 22; again, for nearly 20 years, Plaintiff has unilaterally administered all aspects of broadcast operations for Channel 22, while Defendant has consistently ignored Plaintiff's requests for both non-financial and financial-based support and assistance. Defendant provided rent and utility

payments for Channel 23/109. Defendant blatantly exploited Plaintiff while concurrently providing immediate and robust financial assistance for the administration of Channel 23/109.

55.     Defendant paid to create a state of the art broadcast facility for Channel 23/109 but did not pay a similar amount to Plaintiff for the immediate and robust administration of Channel 22.

56.     Defendant paid the rent, utilities, and salaries for administration of Channel 23, the public access channel, which primarily broadcast "White content" for "White citizens" of Omaha, located at the Center Mall for years; but Defendant did not pay the "operating expenses" of rent, utilities, and salaries to Plaintiff for administration of Channel 22, which broadcast – without regard to race and ethnicity - the most robust content of any television channel in metro Omaha; while Defendant intentionally and adversely labeled both Plaintiff and Channel 22 as a "minority affairs" channel, and restricted the Plaintiff to administer and operate Channel 22 in a ghetto, an area

of urban blight and crime feared by the majority of Omaha citizens who are White, located in a run down community center (Omaha Opportunities Industrialization Center) with a constantly leaking roof and cited on April 20, 2011 by the City of Omaha's Planning and Code Enforcement Department as "Unfit for Human Occupancy."   To be clear, even after repeatedly being informed of safety hazards and documented building code violations blatantly evident to persons viewing Channel 22, vendors, program producers, and persons who entered the Plaintiff's broadcast facility, including Mayor Suttle and City of Omaha Council Members Ben Gray, Jean Stothert, Chris Jerram, and Deputy City Attorney Thomas Mumgaard, Plaintiff was prohibited by Defendant from relocation and forced to broadcast in an unsafe work environment.

57.    The last payment to Plaintiff from Defendant was in approximately 2007.  Defendant has consistently paid all operating expenses, all hardware, all software and employee salaries for Channel 23/109 since before the

Community Programming Agreement was established in 2000. Upon information and belief, Chris Craddock, employed by the Defendant for twenty-sever-(27) years, is paid by Defendant to administer Channel 23/109, which is part of the PEG System. Defendant did not provide a salary to anyone responsible for administration of broadcast operations at Channel 22. Cox provided financial assistance in a separate but equal manner to Channel 23/109 but failed to provide financial assistance to the Plaintiff.

58.     Defendant has benefited from the labor, skill and experience of the Plaintiff's administration of Channel 22 for 24 hours a day, seven days a week, for 365 days each year, and Defendant has not incurred any expense from Plaintiff. Defendant is contractually obligated and financially obligated as stated in the 2000 agreement with the City of Omaha to administer Channel 22. Defendant has received a financial benefit by the Plaintiff's operation of CTI22 Channel 22 since 2000.

59.     From September 2000 until February 2013,

Defendant, Defendant has received approximately $1,650,000 as a result of Plaintiff administering Channel 22, which is based upon $11,000.00 per month. The actual expense incurred by Plaintiff is $2,059,483 during the same time period.

60.     Plaintiff must conduct fund-raising without success, while Defendant financially benefits from the Community Programming Agreement. Plaintiff was treated differently than Channel 23. Plaintiff was not paid by Defendant.

61.     CTAC approved Defendant to administer Channel 22 through March 31, 2013. However, Plaintiff did not receive any notification directly from the Defendant or the City of Omaha regarding the contract extension.

62.     Defendant is a private company, with annual revenue of approximately $15 billion.  However, the Plaintiff inequitably performed the financial burden of administering channel 22.

63.     Defendant was responsible for administering the contract in a nondiscriminatory manner. In May 2012,

37

the City of Omaha became responsible for administering the PEG channels in a nondiscriminatory manner.

64.     The city of Omaha has paid Cox $11,000 per month so that Defendant will continue to manage the PEG during an extended transition period.

65.     The cable system is owned by the citizens of Omaha. Defendant was awarded a lease/license from the City of Omaha for the right-of-way to run cable through the City of Omaha. Upon information and belief, Defendant pays Metropolitan Utilities District (MUD), Omaha Public Power District (OPPD) or similar entities with authority over right-of-way one-(1) dollar a month for every telephone pole that Defendant cable uses to run/string its cable.

## CABLE TELEVISION

66.     Defendant has circumvented First Amendment rights by providing citizens of Omaha with less access to record or broadcast "live" or first-run content which includes the ability to host live call in television shows.

Howie Corbaley, Congressman Lee Terry, Nebraska State Senator Ernie Chambers, Cheryl Westin, Former Omaha City Councilman Frank Brown, Susan Smith, Reynaldo Cervantes, Mario Sanchez, M.D., Marvin McClarity and Gannie Clark among others broadcast their programs on the Plaintiff's station.

67.   Since 2000, the following politicians have recorded, or appeared on, or hosted and broadcast a "live" call-in program during the Plaintiff's administration of channel 22: Bob Kerrey, Lee Terry, John Ewing, Jr., Frank Brown, Ernie Chambers, Brad Ashford, Mayor Jim Suttle, Mayor Hal Daub, Mayor Fahey, Nebraska State Senator Tom White, Nebraska State Senator Brenda Council, Nebraska State Senator Tanya Cook, U.S. Senator Ben Nelson, State of California Regent Ward Connerly and more.

68. Since 2000, as documented in Plaintiff has unilaterally been responsible for administration and promotion of public/community access to Channel 22, including providing broadcast access to the most robust laundry

list of business leaders, politicians, religious groups, community organizations, non-profits, community activists, and others to record, or appear on, or host and broadcast programs on Channel 22. Plus, throughout its administration of Channel 22, Plaintiff is the only PEG channel to provide "live" call-in programs.

69. No other print or broadcast media companies in metro Omaha or Nebraska duplicate the Plaintiff's services, or the scope of operations, or the Plaintiff's immediate access to as great or as diverse an audience. Plaintiff proudly recognizes the achievements of all citizens of metro Omaha and has consistently broadcast the most robust tapestry of content – more than all other metro area TV stations combined:The defendant seeks to eliminate the right of the citizens Omaha to broadcast "live" freedom of speech on the community access channel, and to prohibit interaction with elected politicians, candidates for political office, community activists, and the aforementioned television hosts among others.

## CHANNEL 23 VS. CHANNEL 22

70.      Defendant treated Channel 23 differently than they treated Channel 22 based upon race. Channel 23 and Channel 22 provide exactly the same broadcasting services to Citizens of Omaha. The only difference is originally Channel 23 was the public access channel primarily for individuals and Channel 22 was the community access channel primarily for organizations in Omaha. Ignoring the fact that the clear majority of community-based organizations in metro Omaha are not minority owned, or minority operated, or minority controlled, Defendant unilaterally labeled Channel 22 as its "minority affairs" channel although no agreements identify the Plaintiff or Channel 22 as its "minority affairs" channel.

71.      Defendant paid salary to a Cox employee to operate and manage Channel 23 since 2000. Defendant has not provided any salary to anyone working at Channel 22 at any time.

72. Defendant paid for Channel 23 to move from their

facility located at 42nd and Center to the Cox facility located at 11505 West Dodge Road on or about December 9, 2000. Defendant denied Plaintiff the right to relocate at Plaintiff's expense from a period of 2010 until now. Although the contract specifically grants the Plaintiff the right to relocate, Defendant repeatedly denied the Plaintiff permission to relocate at Plaintiff's expense since 2009. Neither Channel 23 or CTI Channel 22 is the owner of their own building.

73.      Defendant labeled "Community Telecast, Inc.," and "CTI22," and "Channel 22" as a "minority affairs" channel although this language does not appear in any contracts. Conversely, Defendant intentionally labeled the White content-oriented, White-operated and White-controlled Channel 23 a non-racial, generic, non-ethnically derogatory "public access" channel.

74. Defendant was required by the contract to spend at least $60,000.00 to run 200 public service announcements per month promoting the PEGs but Plaintiff did not receive, was not made aware of, and did not benefit from any

promotion conceived and/or developed by Defendant for the Plaintiff.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

75. For their causes of action against the Defendant Plaintiffs allege and state as follows:

76. Plaintiff and Defendant entered a contract in 2000 to provide network ready television programs of the public access station.

77. The contract between Defendant and the Plaintiff states, "Cox will not provide any compensation to TKN, H&W or CTI for any "programming" provided to the system. Furthermore, Cox will not pay any copyright or program fees assessed by a third party vendor for programming provided for use by TKN, H&W or CTI.

78. The contract between Defendant and the Plaintiff does not define "programming" as stated in the contract of adhesion drafted by Cox.

79. Defendant is required to provide PEG channels pursuant

to the contract with the Defendant City of Omaha.

80. As part of that agreement the contract with Defendant and the PEG channels states Defendant will not provide compensation for "programming" to the PEG channels.

81. Defendant provided compensation to and for the administration of public access by providing a paid Cox salaried employee to provide broadcast services.

82. Defendant provided compensation for relocation expenses and other expenses for the entire operation of public access, Channel 23/Channel 109. Plaintiff has not been compensated in a similar fashion based, in part, upon the African-American race of the Plaintiff.

83. Defendant has breached a contract by failing to provide compensation for salaries, expenses and other items to the Plaintiff based, in part, upon his African American race in a same manner in which compensation is provided for the administration of programming for all other PEG channels.

84. The written contract between Plaintiff and Defendant contained an implied covenant of good faith and fair

44

dealing by which Defendant and each of them promised to give full cooperation to the Plaintiff in his performance under the agreement and to refrain from doing any act that would prevent Plaintiff from performing all of the conditions of the agreement to be performed by him, and to refrain from any act that would prevent the Plaintiff's enjoyment of the fruits of the contract. The covenant of good faith and fair dealing required Defendant to fairly, honestly and reasonably perform the terms and conditions of the agreement.

85. The covenant of good faith and fair dealing inheres in every contract and in particular is implied in terms of playing a written contract with Defendant by reason of but not limited to Plaintiff's outstanding performance for Defendant and defense policies of dealing in good faith with Plaintiff.

86. Plaintiff relies on a belief and acceptance in good faith of all the assurances promises or representations by Defendant lead Plaintiff to continue with the terms of the contract. In addition to performing the contractual

terms, the Plaintiff invested substantial sums of money in the channel based upon a good-faith belief that Defendant would honor the terms of the contract.

87. Defendant did not establish or secure for the responsible, and fair and non-discriminatory administration of Channel 22 as required by Franchise Agreements and Community Programming Agreement, and due to Defendant's breach of contract, Plaintiff was required to administer and provide for all broadcast operations and services, has incurred but has not been reimbursed for operating expenses totaling $2,065,181.09.

88. During the period between September 2000 and February 2013 Defendant intentionally discriminated against Plaintiff with respect to the terms and privileges of his contract with the Defendant and by doing so Defendant committed unlawful acts in violation of the contract.

89.     Defendant intentionally breached the contract by refusing to allow the Plaintiff the right pursuant to the contract to relocate at Defendant's expense when

Defendant relocated Channel 23 at the expense of Defendant.

90.     Defendant breached that contract on 2010 by their refusal to respond to Defendant's repeated request to relocate.

91. Plaintiff was damaged in the amount of $2,065,181.09 when the contract with the Defendant was canceled.

## SECOND CAUSE OF ACTION

## QUANTUM MERIT

92. Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein:

93. Between 2000 and the present Plaintiff rendered services to defendant at defendant's request to provide cable services for public access channel as part of the Defendant's cable contract with the City of Omaha.

94. Defendant is a billion dollar corporation and Plaintiff is a 501(c)(3) non-profit.

95. Plaintiff has provided services from 2000 until the present to the Defendant to administer the cable services on Channel 22.

96. Without Plaintiff providing the aforesaid services, Defendant would have been in breach of the cable contract with the City of Omaha.

97. The contract between the defendant and the Plaintiff states, "TKN, H&W and CTI shall be responsible individually for **all expenses involved in providing or distributing their respective programming** over their respective channel(s) including (without limitation) the cost of program production, related    equipment, promotion and any appropriate interconnection with the systems headend; and for the securing all necessary copyright and performance clearances (including music performance clearances) and other required licenses."

98. Cox is responsible for administering all of the PEG channels including Channel 22.

99. Cox provided no definition of "programming" "operating expenses" in the contract.

100.    The express contract between the Plaintiff and the Defendant did not cover the operating expenses of the Plaintiff.

101.    Cox paid for the "operating expenses" of Channel 23 including the relocation and continued operation.

102.    The point which was not covered by the express contract between the Plaintiff and the Defendant was the operating expenses of the Plaintiff.

103.    Operating expenses, which are usual and customary business expenses in the administration of a broadcast entity, was paid by Defendant in operation of Channel 23/Channel 109 includes: rent, utilities, staff, location, telephone service and salaries.

104.    Defendant has refused to pay Plaintiff for his "operating expenses" as demanded in a recent letter on or about February 19, 2013.

105.    Plaintiff also has not been compensated for the community calendar.

106.    Defendant has a license to use the cable right of way from the citizens of Omaha contingent upon Defendant providing three PEG channels, which include Channel 22.

107.    Plaintiff provided PEG services which allowed

Defendant to maintain the license with the City of Omaha.

108.    Defendant received the benefit of Plaintiff's hard work and services and Defendant was able to reap the financial rewards of the cable contract with Omaha based upon providing PEG channel 22.

109.    Defendant compensated the other cable stations for their services, but failed to compensate the Plaintiff based on his race as an African-American.

110.    The usual reasonable and customary fees for work that has been done by Plaintiff for the time period of the start of the contact until present is in the amount of $2,065,181.09.

111.    Plaintiff provided the same service, broadcasting more content, but without compensation from Defendant.

112.    Plaintiff has demanded that Defendant pay the amounts mentioned above but Defendant refused and continues to refuse to pay Plaintiff any part of that amount.

113.    The contract between Defendant and the Plaintiff

does not define "programming" in the contract of adhesion drafted by Defendant. Therefore, Plaintiff demands payment in the amount of $2,065,181.09.

114.    Defendant engaged in a discriminatory practice by keeping the Plaintiff in a location and prohibiting the Plaintiffs move in violation of the 2000 contract.

115.    WHEREFORE, the Plaintiff prays for judgment against the Defendant for all damages as allowed by law.

## THIRD CAUSE OF ACTION

## RES IPSA LOQUITOR

116.    Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein.

117.    Plaintiff and Defendant entered into a contract in 2000 to provide a community access channel.

118.    Defendant had a contract with City of Omaha to administer PEGs in a fair and nondiscriminatory

manner.

119.    If Defendant failed to provide the community access channel, Defendant would breach the contract with the Defendant city of Omaha.

120.    From 2000 until the present, Plaintiff has continually provided the resources to provide the community access channel which allowed Defendant to fulfill the terms of the contract with Defendant city of Omaha to provide a community access channel.

121.    From 2000 until the present, Defendant financially benefited from the community access channel and the resources provided by the Plaintiff.

122.    From 2000 until the present, Defendant provided compensation to the public access, and as reported by Riedel Communications, Inc., on December 9, 2009, Defendant knew equitable salaried compensation is paid to employees at TKN and the H&W and other expenses; but Defendant took no effort to provide similar compensation to the Plaintiff based upon his race.

123.    Plaintiff provided valuable services to Defendant in the amount of $2,065,181.09 from 2000 until the present.

124.    As a result of the services provided, Defendant

financially benefited and fulfilled its contract with the City of Omaha to provide a public/community access channel.

125.     WHEREFORE, the Plaintiff prays for judgment against the Defendant for all damages as allowed by law.

## FOURTH CAUSE OF ACTION

## DISPARATE TREATMENT WITH

## CONTRACTUAL RELATIONSHIP

## BASED UPON RACE

126.     Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein.

127.     Plaintiff was treated differently than the other two PEG television stations although Plaintiff's viewership was equal to or exceeded the other two white controlled and operated stations.

128.     The Defendant intentionally withheld financing from the Plaintiff based upon his race.

129.    Defendant intentionally withheld financing, which was available to the other two stations, which were run by white people, based upon his race.

130.    As a direct foreseeable and proximate result of Defendant's discriminatory acts Plaintiff has suffered financially and continues to suffer substantial losses in earnings, mental and emotional distress, and all too damages in an amount in excess of the minimum jurisdiction of this court the precise amount of which will be proven at trial.

131.    Defendant committed the acts maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiff and acted with an improper and evil motive amounting to malice and a conscious disregard of Plaintiff's rights. Because the acts taken against the Plaintiff were carried out by the Defendant in an intentional manner in order to injure and damage Plaintiff based upon his race. Plaintiff is entitled to recover punitive damages in an amount according to proof.

132.     As a result of the discriminatory acts and Plaintiff has no adequate remedy at law and Defendant continues to engage in the alleged the wrongful practice

133.     WHEREFORE, the Plaintiff prays for judgment against the Defendant for all damages as allowed by law.

## FIFTH CAUSE OF ACTION

## DISPARATE TREATMENT BASED UPON DEFENDANT BRANDING PLAINTIFF AS A "MINORITY AFFAIRS" CHANNEL

134.     Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein.

135.     During the course of Plaintiffs contract with Defendant misrepresented to the general public that Plaintiff was a minority affairs channel.

136.     The contract does not stipulate that the Plaintiff is a minority affairs channel.

137.     Defendant in each event when they made their
above-described representations of fact to the general
public has no reasonable grounds for believing that the
representation was sure. The representations were made
with the intent that the general public rely upon such
broadcasts were minority affairs channel   and the
general public did in fact rely upon the representations
of the Defendant that the Plaintiff's administration of
Channel 22 was confined to minority affairs.

138.     The   Plaintiff's   legal   name   throughout   its
administration of Channel 22 is Community Telecast,
Inc., and has never been Minority Affairs, Inc.

139.     Plaintiff   has   never   restricted   content   being
broadcast on Channel 22 to minorities, which would
have been discriminatory and illegal.  Plus, unlike all
commercial stations and other PEG television channels
in metro Omaha that primarily broadcast content
representing people of the skin color white, the phrase
"all peoples of color" is strategically robust and

inclusive to designate "all" people, all colors, which includes the color white.

140.     In making such representations of fact in suppressing and failing to disclose to the general public that Plaintiff was not a minority affairs channel, and that the Plaintiff's channel is open to all sectors of the general public, Defendant intentionally attempted to lower viewership of Channel 22.

## SIXTH CAUSE OF ACTION

## IMPLIED CONTRACT

141.     Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein.

142.     The term of the Community Programming Agreement is only for a period of two plus (2+) years beginning August 17, 2000 and expiring December 31, 2002, which included a discretionary ""rollover" of 1-year extensions,

143.     Defendant did not send Plaintiff a required 90-day written notification to terminate Plaintiff's responsibility for its unilateral administration of Channel 22.

144.     Therefore, Plaintiff requests that the court rule an

implied-in-fact contract exists and the Plaintiff is entitled to $2,052,483.50.

## SEVENTH CAUSE OF ACTION

## UNJUST ENRICHMENT

145.    Plaintiff incorporates the preceding paragraphs of his Complaint as if expressly set forth herein.

146.    Between 2000 and the present Plaintiff rendered services to defendant at defendant's request to provide cable services for public access channel as part of the Defendant's cable contract with

147.    Defendant is a billion dollar corporation and Plaintiff is a 501(c)(3) non-profit

148.    Plaintiff has provided services from 2000 until the present to the Defendant administer the cable services on Channel 22.

149.    Without Plaintiff providing the aforesaid services, Defendant would have been in breach of the cable contract with Cox Cable for the City of Omaha.

150.    Defendant did not expect and it was reasonable that channel 23 and the other stations received "operating expenses" from Defendant.

151.    Defendant did not compensate Plaintiff for "operating expenses" for the services provided.

152.    Defendant was unjustly enriched by the services of Plaintiff.

153.    Plaintiff requests $2,052,483.50. for the services provided to the Defendant.

154.    WHEREFORE, Plaintiffs prays for a judgment against the Defendant, in an amount representing the value of the services contributed to Plaintiff's costs incurred herein, and compensation for attorney fees as allowed by law, the costs of this action, interest as allowed by law, and any other relief which the court deems equitable and for such other damages which is reasonable in the premises. Plaintiffs demand a jury trial.

155.    Wherefore Plaintiffs request the following relief:

156.    For a ruling that a contract exists between the Defendant and all parties

157.    For a ruling that Defendant breached the contract;

158.    For a ruling in the Plaintiff's favor for breach of contract quantum meruit, res ipsa loquitor an implied contract, disparate treatment with contractual relationship based on race and unjust enrichment and the allegations and law set forth in the above complaint;

159.    For general and specific damages as allowed by law;

160.    For attorney fees and costs;

161.    For punitive damages,

162.    If appropriate for such other and further relief as the court shall deem just and proper under the circumstances.

DATED this 14th day of March, 2013.

> Respectfully   Submitted,   Plaintiffs
> Harold   Reynolds,   and   Community
> Telecast, Inc.,
> By: s/Timothy L. Ashford/
> Timothy L. Ashford, #19687
> Empire State Building
> 300 South 19th Street,
> Suite 316
> Omaha, Nebraska 68102
> (402) 342-8888
> Attorneys for Plaintiff